Good morning. Please, the Court. Dave Barnett for Pine Resources. We are on a return trip to the Fourth Circuit in this particular case. The case, when it originally appeared before you, had been on summary judgment. And at that particular time, the Court sent this case back down to the District Court, and the direction was to address the issue of injury in the first instance. This Court had recognized, at the time of our first appearance, that it was our position that the noncompliance with the contract, called the PSA in this particular case, impaired Pine's prospects of receiving royalties in the future. The opinion of the District Court notes this Court's finding that the Pine PSA had an apparent objective of promoting mineral production, which it describes as an elaborate production scheme. That's referring to your opinion by the District Court. What the District Court did then, and it's set forth in their footnote 3, which is contained in the decision, the Court attacked the finding of the Fourth Circuit. It said, essentially, that the District Court disagreed with what the Fourth Circuit did, and went on, basically, to make a second finding consistent with their first finding. And that particular finding can be quickly summarized, or briefly summarized, in saying that the District Court felt that the PSA did not require production. Did not require production. The fallacy of that is twofold. First of all, the District Court relied upon the testimony of my client, Rich Hefflinger. Pine Resources is an entity which is owned by two individuals, Mr. Rubin and Mr. Hefflinger. It's a family-owned business, basically. At the time of the PSA with Petrotech, which was the original purchaser of this property, I would submit to the Court, and I believe the Court recognized in the first instance, there was no dispute that there was to be a drilling of three wells. And, in fact, Petrotech drilled, or began to drill, one of the wells, taking it down some 6,000 feet and taking it across several thousand feet until it began to touch the property of my client's. To touch the property for the first instance, because the pad was located on an adjacent piece of property, unrelated to my client's property. Petrotech was not diligent in doing this. They did, in fact, seek the tap for the transmission of the natural gas. They, however, went beyond the initial one-year period which was required. And to that end, they paid my client $100,000 for an extension of that time period. And, in fact, they sought a second extension, which was granted without compensation, because at that particular time, Petrotech had already begun drilling, had drilled down on the horizontal some 6,000 feet, and they were in the process of obtaining a rig to do the lateral drilling, which would take, in fact, this well onto my client's property. Shortly thereafter, Statoil, which is now known by another name, acquired this property. And, in fact, in doing so, that ended the effort on behalf of the owner of the property to do any further drilling, do any further exploration, to do anything which would result in the generation of revenues from my client. Now, let me draw a connection here that I think is critically important. It appears to be a little bit of a jump. But both of the experts which testified as to damages, our experts said that it was approximately $7 million to drill each well, or $21 million total. That was Mr. Wright. Mr. Lanham calculated that it would be about $8 million per well, or a total of $24 million. Now, if we look at that, if we take that valuation, understanding that what we were asking and what the contract compelled was, three wells worth either $21 or $24 million, and the suggestion that there is no obligation, that there is no compelling factor which would result in production, is simply destroyed by the costs attended to drilling these three wells. If you have $21 or $24 million, let's take as an example an office building. Let's say this was not oil and gas, but we had an obligation on property that we sold for someone to build an office building, spend $24 million. And we would receive 18%, as we did with this overriding royalty, of the rents off that office building. The logic the district court uses is that building could sit empty, and there would be no revenue flowing to my clients, no 18% flowing to my clients. And that simply flies in the sense of business sense, economics, and the way these types of deals are structured. But you used the word splitting in your contract. Does that mean actually complete the drilling of a well, or does it mean you just start drilling? Judge Floyd, I think it's a red herring is what it is. And I think I'm really at fault maybe in the first appearance for not dealing with that in a more aggressive manner. If you look at the entirety of the contract, it talks about drilling three wells. And it has sort of triggering events. One of those triggering events is the tap. Another is sputting the wells. Another is, you know, production at that point. What I'm telling the court is it's a red herring to say that somehow spud is the magic start and end of the entire process. To spud onto our property required drilling down 6,000 feet and over several thousand feet before it touched the property which is in question. And as was indicated by their expert, and as by our expert, that was about $4 million in cost. $4 million, and that doesn't include the cost attendant to building the pad, the engineering, the permitting. So quite frankly, what we had was at the time Petrotech sold to Statoil, they had put many millions of dollars into taking this well down, taking it across, and touching our property, which in my belief was the spud in this particular case. But again, it's a red herring because we have to look at the entire section, 5.5 of the PSA, it says they have to meet and discuss drilling plans. It's 5.7, it says three wells within five years. 5.8 deals with abandonment. The entire crux of the contract, and what this court recognized in its first decision was, there was an elaborate scheme of production. And that elaborate scheme of production has simply been stopped dead in its tracks by the folks at Statoil. And the irony of that, the incredible irony of that, if we look at the contract between Petrotech and Statoil, we look at their exhibit 3.25. Their own exhibit, completely apart from us, between Petrotech and Statoil, says they had an obligation at 3.5 to drill two additional wells. Drill two additional wells. Not spud, not touch, not do anything else, but drill wells. And in fact, they presented the testimony of Dick McCann by deposition. Mr. McCann, if you look at his testimony from deposition, he is the individual who wrote two summaries. And the summaries say, in the McCann summary, J.A. 2010, there are outstanding drilling obligations on this property. And the second summary of 7.9.12 says three wells within five years. Now, not three spuds, not three touching the ground, not going down 6,000 feet and several thousand feet across to touch, but in fact it talks about wells. And that, I believe, was my mistake. The district judge in this case found the contract to be ambiguous, and he took extrinsic evidence, which may have been, probably not. But had he taken the extrinsic evidence, he still ruled against you. So what was wrong? Judge, the fundamental premise of the contract between my clients, Pine and Petrotech, was for the production of oil and gas on that particular property. The 18% overriding royalty, the complicated scheme that this court recognized, is there for a sole reason, and that's to get oil and gas out of the ground during the lifetime of my two clients. And, in fact, the judge relies upon my client, Mr. Hefflinger's, testimony, though she mischaracterizes that testimony. She says, apparently, that Mr. Hefflinger supports the idea that there's not a requirement or an obligation to produce. However, if we look at his actual testimony, what he was asked was whether or not the PSA required maximum production, and he answered, quote, it doesn't tell them how to produce once they complete and produce the wells. Then he was asked by Statoil's counsel, could, in fact, they, Statoil, sit on its multimillion-dollar wells and not produce? He answered, I guess that's possible. And that goes back to my economic argument, my argument which only makes business sense in the context of if you're spending $24 million to drill three wells, you're going to produce. You're going to recapture the cost of that drilling and that pad and that engineering and that permitting and all of those things which you're attending. And the problem here is Statoil simply didn't do anything. They didn't meet their obligation under the PSA. Their word was not good. The word of the contract was not followed by them. And their response, quite frankly, in this particular case, when confronted about this, well, if you sue us, we'll bankrupt you. That's the testimony of Mr. Hefflinger in 1547. And Mr. Hefflinger also testified that Larry Richard, the principal at Petrotech, told him, I'm not going to spend millions of dollars drilling a well and not produce them, the Joint Appendix 1517. The problem that we've got here is that Statoil had no intention. After it looked at these wells of meeting the terms and obligations of the contract, and the net effect of that is my clients were deprived and continue to be deprived of any opportunity to receive royalties under that particular contract. The district court became somewhat fixed on the fact that over $400,000 was paid for this property in fee, which was only slightly less than they paid for it 10 years earlier. And my point is, and I understand why that sort of also has directed the court's attention in the wrong direction, but the Marcellus wasn't known at that time. It wasn't exploited at that time. And in fact, Marcellus is very expensive and valuable real estate. And if we think of that valuable real estate having an office building being built on it for $24 million, it's not going to sit empty. It's going to get leased out. Revenue is going to be generated. And my clients in this particular case would receive their 18% of a royalty. There are, and if I can briefly address the damage issue, there were only three witnesses at this two-day trial. My client, Mr. Hefflinger, and then we had the two experts. The expert who testified for Pine found damages in the amount of $1.846 million, $1.8 million plus in damages. He is, as testimony reflected, the individual in this particular area to do this work. He was sought by both Stato and my client to be their expert. And his testimony was, regardless of who hired him, he was going to give the same report and make the same finding. Stato's expert, while promoting a variety of damage numbers on a variety of dates, appears at one point to have found $880,800 in damages. What I'm suggesting this indicates is that my client's testimony, Mr. Hefflinger, Mr. Wright, and Mr. Latham, all found damages. And by finding damages, it suggests a number of things. Number one, damages, in fact, should be awarded to my client. It also suggests that the wells are economically viable. Are you suggesting that they forfeited their argument on liability by bringing up an expert to counter your expert on damages? Is that what you're saying? Yes. That would be very unusual because we often have cases where the two parties, in fact, you were here for the argument this morning. The two parties are arguing about liability, right? Right. And the damages question is separate. I suppose if there's no liability, you get no damages. You haven't forfeited anything by putting up an expert on damages. Judge Moss, I think the unusual thing here is that the damages become important, really, not so much for damages. Obviously, my client's entitled to $1.8 million. But the fact that this $24 million is a cost that was avoided by Statoil, by stiffing my clients under the PSA, by saying we're just not going to meet our obligations. Unless the PSA permitted them to do it and it wasn't sticking them and they have no liability. I mean, you're assuming you're right, but maybe the contract doesn't provide for this. Well, the problem, though, as I've indicated, is even they recognize their obligation to drill three wells. Even their own agreements and their own summaries and their own testimony by Mr. McCann recognize that three-well obligation. They had an obligation to spud. But I think your time has expired. We can read your contract. Thank you. Good morning, Your Honor. May I proceed? Yes, you may. Fields Alexander here on behalf of Equinor USA Onshore Properties. It's ironic, in light of Mr. Heffelfinger's statement for the first time to the lower court that if you sue us, we'll bankrupt you, that it was Equinor that brought this action, seeking a declaratory judgment in federal court. Equinor, frankly, would be entitled to a judgment in his favor from the district court on any of three separate bases. Number one, the court could have concluded that the only obligation in the contract was to spud wells, and a spud well is not a completed well. Therefore, there was no requirement to produce. Number two, the court could have found under the contract that there was no contractual obligation to produce from wells, irrespective of whether or not they were completed, because that obligation simply doesn't exist in the contract. Or number three, the court could have concluded, as it did conclude, that the contract is ambiguous as to whether or not production was required. The court could have considered all the extrinsic evidence either side was able to put forth, and the court could have concluded, based on that evidence, there was no obligation to produce from these wells under this contract, even considering all the evidence that Pine could put forth in its favor. That's the route the court chose. Respectfully, the court could have found this contract unambiguous and ruled in Equinor's favor on either of the first two bases that I presented. Frankly, Your Honors, the seminal fact in this case is that Mr. Heffelfinger conceded at trial that production from the wells was not required. So that even if you assume that spud doesn't mean spud, which no court has ever found, and which none of the experts, none of the witnesses conceded. In fact, every witness that testified in this case agreed with the fact that spud means spud, and we also cited to the court and put it in the record a number of definitions, industry and otherwise, for the fact that spud means spud, that is to start a well. But that even if you concede that somehow spud meant to complete wells to Pine's liking, which again was an undefined term in the contract, there was no requirement under the contract under anyone's interpretation that those wells needed to begin producing immediately. In fact, as Mr. Heffelfinger conceded in testimony, Statoil, now Equinor, could have deferred the production until economic conditions warranted. And that's the crux of the issue in this case, irrespective of all the contractual arguments that we made in the lower court and that I repeat to this court now. Whoever was the producer under the contract, whether it be Petro-Edge or Equinor or now Alliance, at the very least is able to defer production of the minerals that they now own. And again, this was not a lease. This was a very unusual and complicated and sophisticated transaction done by folks with decades of experience in the oil and gas industry at management levels and who were represented by counsel on both sides. And it was Pine that chose to do this transaction as a conveyance and not a lease. And the reason they did that was because they wanted the capital tax gains benefit that flowed from that. Pine chose this contract. Pine chose the method. And Pine chose to convey the Marsalis minerals outright to the producer, which had been Petro-Edge, then became Equinor, and is now Alliance. Pine reserved for itself an 18% overriding royalty interest such that whenever those minerals were extracted, be it next year, next decade, or 40 years from now, Pine or its successor will be entitled to an 18% royalty interest in those minerals, irregardless. But Pine has no right under the contract to dictate the timing of that production, the pace of that production, or the type of wells to be drilled, all of which were factors that the trial court addressed in considering what difficulties any court would be confronted if it was going to try to rewrite the contract into a contract that Pine now says it wishes it had. There's no question but that, as this court found, that portions of this contract were designed to promote mineral production. Sure, if I was in Pine's shoes, I would want to promote mineral production as well. The question is, what was Pine able to get Petro-Edge to be required to do? And there's simply, not only is there nothing in the contract that suggests that Petro-Edge was required to complete wells or produce from those wells at Pine's desired pace. In fact, virtually all of the extrinsic evidence suggests, if not strongly suggests otherwise. I'll remind the court, and it's rampant throughout the record, that both before and after the transaction between Petro-Edge and Statoil, now Equinor, Petro-Edge repeatedly told Statoil, now Equinor, that the only obligation was to spud wells and that the first obligation had already been met as to the one well. Now remember, this was a well that had been spud, and my learned adversary addresses the fact that the well went down 6,000 feet and crossed into the lateral, and that's for a unique set of circumstances because that well was drilled on a pad that was adjacent to this property. Therefore, for it to enter into the Marcellus zone of this property, they were required to do that. But Petro-Edge repeatedly told Equinor, that obligation as to that well has been met. This was a well that was never completed. This was a well that was never producing. And not only did Petro-Edge tell us that in multiple communications leading up to the contract, they actually warranted that result in Section 3.25, which was cited by opposing counsel to this court a minute ago. In Schedule 3.5 of the Statoil-Petro-Edge PSA, Petro-Edge told us in no uncertain terms that the obligation as to the first well has been met. And that wasn't the only place that was found. It was found in a number of documents, all of which were before the district court, all of which are included in the record, and we've cited to this court. So respectfully, Your Honors, again, the district court could have decided this case in our favor on contractual grounds by finding, as I believe, that the contract was not ambiguous as a matter of law and that spud means spud, or by finding the contract, whatever it means, doesn't require production at Pine's pace and Pine's desired timetable. Or the court could have said, we'll give Pine every benefit of the doubt. We'll consider all the extrinsic evidence either side wants to put forward, and we'll decide based on that that, yes, the parties read the contract the same way I read the contract, that is, that there is no production requirement, much less a production requirement on Pine's desired timetable with Pine's desired wells. But didn't your client think that there would eventually be a well on the property? No question about it, Your Honor. All right. But you're saying there's no requirement as to when it has to be done or what amount has to be produced on it, correct? Judge, the requirement was that one well had to be spud within a year, and three wells had to be spud within five years, three total. That is, the one plus two others. That was the sole contractual requirement. That was done as to one well, there's no question, and we conceded before the lower court and conceded before this court that the last two wells were never spud. The question is what remedy flows from that. So, yes, wells used in the colloquial term were required. Our position is the contract is pretty unambiguous as to the fact that by well, the contract means spud, that is, a well needed to be started. But even if the court concludes that a well means a completed well, that doesn't mean a completed and producing well. And, in fact, there's overwhelming evidence in the record to support the trial court's finding that no production was required under this contract. I suppose that the production aspect of this thing would depend on what you think the market should do. Well, that's exactly right, Your Honor, and that's, in fact, what Mr. Heffelfinger conceded at trial, which was that whoever was on the other side of this contract from Pine would be entitled to defer production as economic conditions warranted. So that's quite right. And, in fact, it's of no small moment that the price of gas imploded following the original deal between Pine and Petra Edge and has yet to rebound to my knowledge. I don't think it's germane to the contractual obligations, but it's certainly germane to the economic considerations that nobody wants to drill these wells. In fact, in the record is the fact that when Stadl was trying to deal with this issue, short of having to go to court and being before this court, Stadl tried to give away these minerals for free to anyone who was willing to produce them, and nobody would take them. Yes, Your Honor. If there are no further questions from the court, I thank the court for its time, and I'll cede the remainder of my argument time. A very few comments, but I want to make sure a couple things are not lost in the fire and the fury of the exchange here. It is critical to note, no matter how we view the obligation to drill these wells, we're going to call it sputting, that it was never done. Nothing was ever done after the Petra Tech transition. Bottom line, they were in breach of the contract. They did not meet the obligations within that five-year period. It is also critical in light of the fact that the pad they constructed was on another's property. It is critical to note that Petra Tech, even though they drilled the horizontal 6,000, asked for a further extension of time so that it could then drill the lateral onto our property. They acknowledged by their actions that they had an obligation not just to sput, not just to touch, but to drill down and drill across until it got onto the property, which was owned by Pine. That goes back to the simple fact that there was an agreement. If the agreement had been followed, if the wells had been drilled, even if they were shut in for a period of time, those wells would be in existence, there would be $24 million worth of asset in the ground, and there would be a strong incentive to recover the funds that were utilized to drill those wells. And that would result in income to my client. And that's why, when the experts talk about $880,000 or $1.8 million in damages, that's how those calculations arise. The simple fact is Statoil made a decision to put their assets elsewhere, and in doing so they breached this particular contract. Happy to answer any questions. I think the Court understands my position. Thank you all. We'll ask the clerk to adjourn until 4 p.m. This Honorable Court stands adjourned until 4 p.m.
judges: Roger L. Gregory, Diana Gribbon Motz, Henry F. Floyd